IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON TAYLOR            *
                                   *
v.                            *      Civil Action No. WMN-12-3794
                                   *
PENINSULA REGIONAL       *
MEDICAL CENTER            *
                                   *
                                   *

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

This case involves claims of employment discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Before the Court is a Motion for Summary Judgment as to all claims, filed by Defendant Peninsula Regional Medical Center ("PRMC"). ECF No. 19. In his Opposition, Plaintiff Brandon Taylor ("Taylor") voluntarily dismissed his employment discrimination claims, leaving for the Court's determination the summary judgment motion as to Taylor's retaliation claims only. See ECF No. 22-1 at 1. For the reasons that follow, the Court determines that no hearing is necessary, Local Rule 105.6, and Defendant's Motion for Summary Judgment will be granted.

## I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Taylor, an African-American male, was employed as a security officer with PRMC from June 2006 until July 2010. Taylor worked in the Security Department under Shift Supervisor

1

Anthony Tull, Director of Protection Services Alonzo Tull ("Chief Tull"), and Director of Facilities and Maintenance Bruce Patterson. During the course of Taylor's employment, he received multiple salary increases, equaling a raise of approximately $2.50 per hour over the course of his employment. He received his final raise on June 6, 2010. He also received two promotions, ultimately achieving the title of Corporal in 2010.

Prior to June 2010, Taylor had received only positive reviews from his supervisors and was not involved in any disciplinary incidents. Between June and July 2010, however, Taylor was involved in multiple workplace incidents relevant to his ultimate separation from PRMC. The first incident, for which Taylor ultimately was not disciplined, occurred in June 2010 and involved a patient who fell in the Emergency Department in the presence of Taylor, two other officers, and a nurse (the "ED incident"). Patterson and Chief Tull reviewed videotape footage to determine whether the patient was pushed by a security officer or fell of her own accord. All three officers were placed on administrative leave until it was determined that the patient was not pushed. The officers each received a written warning for failing to help the patient up or seeing if she was injured. The nurse involved in the incident was terminated.

Taylor, believing that he was unfairly disciplined for the incident, visited Lura Lunsford, the Executive Vice President and Chief Operating Officer at PRMC. He expressed concern regarding the discipline imposed, and stated that he perceived Patterson to be racially biased. After investigating Taylor's concerns, Lunsford concluded that the officers' actions were consistent with their training and that the discipline was therefore unwarranted. Upon conferring with Patterson and the individual who initially imposed the discipline, the written warnings were rescinded and the incident was removed from Taylor's disciplinary record.

During Lunsford's investigation into the ED incident, Taylor reported a comment allegedly made by Patterson over the PRMC radio system in May or June 2009. Taylor alleged that Patterson, in reference to construction workers on PRMC property, said to "get the damn Mexicans off of the property."[1] Although Defendant notes that Taylor did not mention the comment until June 2010, Taylor alleges that he complained about Patterson's statement the day after it was made to his direct supervisor, Anthony Tull. Taylor's coworker Tyrone Douglas apparently later confirmed, via text message to Taylor, that Patterson made the comment as alleged. See ECF No. 22-5. After

---

[1] Taylor alleges that he took offense to the comment because his children are half-Hispanic.

investigating the incident, however, PRMC stated that it was
unable to corroborate that Patterson's statement occurred.  To
the extent that Patterson may have commented on the presence of
the construction workers, Defendant asserts that his statement
was intended to convey that non-English speaking construction
workers could not be responsible for directing traffic and
speaking with drivers for safety concerns.

The second disciplinary incident involved a complaint from
an employee who called security at 7:26 a.m. on July 2, 2010,
seeking help because a cleaning machine vendor was circling her
vehicle in the parking lot.  Taylor took the call, but did not
assist the employee.  Although Taylor contends that he explained
to the employee that the vendor was simply doing its job, PRMC
asserts that Taylor repeatedly changed his story regarding the
allegations.  Specifically, Taylor allegedly stated, at various
times, that he was too busy to assist the employee, could not do
anything because the complaint involved a vendor, and that he
did not take the call.

Around this time, Taylor was tangentially involved in an
investigation into sexual harassment allegations against Chief
Tull.  Taylor apparently encouraged two female employees with
concerns about Chief Tull to speak with Human Resources.  The
Human Resources Director, Mitzi Scott, attempted to interview
Taylor regarding the allegations multiple times.  PRMC states

that Taylor did not cooperate with the investigation, and was evasive and difficult.  By contrast, Taylor argues that, to the extent that his responses could be characterized as evasive, it was because he did not know anything about the allegations and was not involved in the relevant incident.  During a meeting with Scott regarding the matter on July 7, Taylor reiterated his general concerns about racial bias.  Scott directed Taylor to create a "narrative" outlining his concerns, which Taylor later provided to Scott.  In this narrative, Taylor noted specifically his concerns regarding Patterson and race, and his belief that he was unfairly passed over for the opportunity to carry a weapon as a security officer and was paid less than white officers.  <u>See</u> ECF No. 22-11.

PRMC alleges that, during a subsequent meeting with Scott on July 15, 2010, Taylor "began to raise his voice, was speaking very loudly, and accused the Hospital of discriminating against him and repeatedly called Ms. Scott a racist."  ECF No. 19-1 at 26.  Scott alleges that, as a result of Taylor's conduct during the meeting, she became afraid.  Because Taylor "refus[ed] to cooperate during [the] investigation[,] … chang[ed his] stories" and behaved poorly in her office, Scott informed Taylor that he was being placed on administrative leave.  <u>See</u> ECF No. 22-7 at 17.  She provided Taylor with a Non-Disclosure/Non-Disparage Agreement, prepared prior to the meeting with Taylor on that

day, which instructed him to surrender his badge and prohibited him from disclosing "any aspect of this matter to anyone." Taylor apparently then stated that he was "going to go to the news and had already filed an EEOC complaint." ECF No. 19-1 at 27. When Scott informed him that she was going to get security to escort him from the building, Taylor walked out of her office and, "as he did so, turned around and pulled what appeared to be a small audio recorder out of his pocket and said 'Gotcha.'" Id.

The parties present two different stories about what transpired next. PRMC alleges that Taylor called on July 19, 2010, and spoke with Lunsford's secretary, Karen Long. Long reported in an e-mail to Lunsford that Taylor's resignation from PRMC would be forthcoming. Approximately one week later, having received nothing from Taylor, PRMC wrote to Taylor to accept his verbal resignation and formally separate as of July 26, 2010. Taylor, by contrast, contends that he did not resign. He asserts that he "had no contact with PRMC until he received a notice of Disciplinary Action dated July 16, 2010" and signed on July 26, which notes that he verbally resigned on July 19, 2010. ECF No. 22-1 at 7. The notice details Taylor's recent behavior, including his allegations against Patterson and the investigation into Chief Tull. It specifically notes that Taylor "had no firsthand knowledge of any of the improper

conduct by [Chief Tull] that [Taylor] publically alleged" to another employee, that he became hostile toward Scott, and that he routinely changed his explanations regarding the above incidents. It stated, "Your conduct constitutes making defaming, slanderous or false statements; deliberate omission, falsifications or misrepresentation of material information during an investigation; retaliatory conduct against your management team; hostile and intimidating conduct while on duty." ECF No. 22-14.

Taylor later filed for unemployment insurance benefits, which PRMC contested. On May 12, 2011, the Maryland Department of Labor, Licensing and Regulation determined that Taylor was discharged for reasons other than misconduct during performance of his duties, and awarded Taylor unemployment insurance benefits.

Taylor also filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 19, 2011. The EEOC sent PRMC a Notice of Charge of Discrimination on February 4, 2011, which identified that Taylor had filed a minimally sufficient charge alleging racial discrimination and retaliation. The Notice stated that PRMC would be forwarded a "perfected charge . . . for a complete response," and noted that, "due to EEOC error, notice of the charge was not served within 10 days of receipt." ECF No. 22-18. It appears that

PRMC did not receive a perfected charge because the EEOC misplaced Taylor's intake questionnaire. Taylor contacted the EEOC on multiple occasions to obtain a copy of the charge, including sending a letter from his counsel dated August 24, 2011.[2] Eventually, after enlisting the assistance of his congressional representative, Taylor received a response from the EEOC stating that it had misplaced the original charge. The EEOC contacted Taylor, through counsel, to request additional information so that it could draft a new charge on Taylor's behalf. The new charge was filed on March 8, 2012, forwarded to PRMC on March 29, 2012, and a right to sue letter was issued on November 30, 2012.

Taylor filed suit in this Court in December 2012, alleging the following four counts: (1) racial discrimination under 42 U.S.C. § 2000e (Title VII); (2) retaliation under 42 U.S.C. § 2000e (Title VII); (3) racial discrimination in the making and enforcement of Plaintiff's employment contract under 42 U.S.C. § 1981; and (4) retaliation under 42 U.S.C. § 1981. As noted above, Taylor voluntarily dismissed counts one and three. See ECF No. 22-1 at 1. After the conclusion of discovery, Defendant PRMC filed the presently-pending Motion for Summary Judgment.

---

[2] Although Taylor asserts he contacted the EEOC multiple times, only the August 24 letter is attached to his Opposition motion. The letter, written by his counsel, references an attempt "several months" prior to contact the EEOC. See ECF No. 22-20.

## II.  **LEGAL STANDARD**

The purpose of summary judgment is to dismiss claims and defenses that lack evidentiary support.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, the Court will grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  In ruling on a motion for summary judgment, all facts and inferences will be drawn in the light most favorable to the non-moving party. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).  A motion for summary judgment will be denied when there is a "dispute about a material fact [that] is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the record taken as a whole, however, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 564, 587 (1986).

Generally, a court "may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge. . . ."  Anderson, 477 U.S. at
255.

### III. ANALYSIS

#### A. Timeliness of EEOC Charge

Defendant asserts, as a threshold matter, that Taylor's
claims are barred because he failed to file a timely charge with
the EEOC.  Before a plaintiff may file suit under Title VII, "he
is required to file a charge of discrimination with the EEOC."
Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009)
(citing 42 U.S.C. § 2000e-5(f)(1)).  In Maryland, a charge of
discrimination must be filed within 300 days of the allegedly
unlawful employment practice.  See Walton v. Guidant Sales
Corp., 417 F. Supp. 2d 719, 721-22 (D. Md. 2006).  The
plaintiff's right to file a federal lawsuit is limited in scope
to the contents of the charge.  Specifically, "[o]nly those
discrimination claims stated in the initial charge, those
reasonably related to the original complaint, and those
developed by reasonable investigation of the original complaint
may be maintained in a subsequent Title VII lawsuit."  Evans v.
Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir.
1996).

Although Title VII does not define "charge," see Edelman v.
Lynchburg Coll., 535 U.S. 106, 112 (2002), an EEOC intake
questionnaire may generally be considered a charge if it

contains "the information required by the [EEOC's] regulations, i.e., an allegation [of discriminatory conduct] and the name of the charged party," and can be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."  Federal Express Corp. v. Holowecki, 552 U.S. 389, 402 (2008).  EEOC regulations provide that a "charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b). Charges may also be amended to cure defects, and will "relate back to the date the charge was first received" if the amendment "(1) 'cure[s] technical defects or omissions, including failure to verify the charge,' (2) 'clarif[ies] and amplif[ies] allegations made therein,' or (3) 'allege[s] additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge.'" EEOC v. Randstad, 685 F.3d 433, 443 (4th Cir. 2012) (quoting 29 C.F.R. § 1601.12(b)) (alterations in original).

Defendant asserts that, because Taylor was unable to produce a copy of the 2011 intake questionnaire, it is impossible to know whether it satisfied the conditions necessary to be considered a charge of discrimination.  Accordingly,

Defendant asserts, it cannot be considered a timely charge.  By contrast, Taylor argues that, even assuming that the Notice of Charge of Discrimination received by PRMC is insufficient to demonstrate that a charge was filed, he is entitled to relation back of his perfected charge or equitable tolling of the limitations period because the intake questionnaire was lost through EEOC error.

In support of its argument that Taylor's charge was untimely, Defendant relies principally on Walton v. Guidant Sales Corporation, 417 F. Supp. 2d 719 (D. Md. 2006).  In Walton, the court determined that plaintiff did not file a timely charge where his ultimate charge was undisputedly untimely, but he claimed to have "submitted a previous 'document' sometime before the statutory deadline."  Id. at 722.  The plaintiff asserted that he mailed an intake questionnaire to the EEOC, which the EEOC was subsequently unable to locate in its files.  Notably, the EEOC had no record of ever receiving the intake questionnaire, but later processed the plaintiff's charge of discrimination based on his assertions and on confirmation that the plaintiff telephoned the EEOC around the time of his alleged submission.  The Walton court found that the plaintiff did not sufficiently establish that he complied with the administrative exhaustion requirement, specifically noting "the absence of any document whatsoever in the files of the EEOC

(or in [plaintiff's] personal files) demonstrating that [plaintiff] filed a minimally sufficient charge of discrimination." Id. at 724. The court also declined to apply the doctrine of equitable tolling, noting that the plaintiff failed to show that he diligently pursued his claim, or that he was somehow misinformed or misled by the EEOC.

Defendant contends that Taylor's scenario is "strikingly similar" to that in Walton. ECF No. 19-1 at 35. The Court disagrees. Here, unlike the plaintiff in Walton, Taylor has produced more than mere speculation that he filed an intake questionnaire with the EEOC. The EEOC mailed, and PRMC received, a notice of filing of charge on February 8, 2011, which stated that the "EEOC received documentation constituting a minimally sufficient charge of discrimination." ECF No. 22-18. The EEOC Charge Detail Inquiry reflects that action was taken in regard to "formaliz[ing the] charge" on January 19, 2011. ECF No. 22-17. Although neither the EEOC nor Taylor has been able to produce the intake questionnaire, it is clear, from the Notice of Filing of Charge, that it identified (1) PRMC as the employer; (2) the issues of discharge, suspension, and wages; and (3) relevant dates spanning September 1, 2009, to July 23, 2010. ECF No. 22-18. There is also evidence that the EEOC construed the request as one to take action to vindicate Taylor's claim, as the notice to PRMC stated that "[d]uring the

investigative process, a perfected charge will be forwarded to [PRMC] for a complete response." Id.

Moreover, the EEOC has acknowledged that it committed error in misplacing and failing to follow up on Taylor's charge. Because the primary purpose of the EEOC filing requirement is to provide the employer with notice of the charge against it, and PRMC was undisputedly on notice that Taylor was asserting racial discrimination and retaliation claims against it, the Court concludes that Taylor's amended formal charge may relate back to his original, timely-filed charge and cure any technical defects that may have existed.

## B. **Retaliation Under 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981**

With regard to Taylor's substantive allegations, Defendant contends that Taylor has failed to set forth a prima facie case of retaliation. Under 42 U.S.C. § 2000e-3(a), an employer may not "discriminate against any of its employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . ." In order to succeed on a claim of retaliation under either Title VII or § 1981, a plaintiff must demonstrate that "(1) [he] engaged in protected activity, (2) the employer took adverse employment action against [him], and (3) a causal connection existed between the protected activity and the

14

asserted adverse action." Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001) (citing Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1999)).

A plaintiff may not, however, survive summary judgment simply by establishing a prima facie case. Rather, once the plaintiff has established a prima facie case, the burden shifts to the defendant to produce evidence of "a legitimate nondiscriminatory reason for the adverse action." Church v. Maryland, 180 F. Supp. 2d 708, 744 (D. Md. 2002) (citation omitted). If the defendant satisfactorily demonstrates the existence of a nondiscriminatory reason for the adverse action, the burden "shifts back to the plaintiff to show that those reasons are pretextual." Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 242 (4th Cir. 1997) (citing Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994)); see generally McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

Taylor argues that he engaged in protected activities when he (1) complained to Lunsford regarding Patterson's "Mexicans" remark; (2) complained to Lunsford regarding pay disparities and weapon assignment disparities; and (3) submitted written correspondence to Scott identifying his concerns regarding racial bias. See ECF No. 22-1 at 19. Defendant does not appear to contradict Taylor's assertion that he engaged in protected activity. See ECF No. 19-1 at 52 ("For purposes of this motion,

it will be assumed that Mr. Taylor can satisfy the first element of a prima facie case of retaliation (that he engaged in protected activity).").

Defendant contends that Taylor has failed to establish a genuine dispute of material fact with respect to the remaining two elements. Regarding the existence of adverse employment action, Defendant argues that Taylor resigned, and was not terminated,[3] from his position at PRMC. In support, Defendant notes that the assistant to Lunsford, Karen Long, wrote an e-mail message to Lunsford to commemorate a conversation she had with Taylor on Monday, July 19, 2010. See ECF No. 19-38 at 2-3. The e-mail, which was sent at 11:27 a.m. that day, states in relevant part "that shortly we will receive [Taylor's] 'resignation and other paperwork.'" ECF No. 19-25. One week later, after not receiving a written resignation from Taylor, Defendant "wrote to Mr. Taylor accepting his verbal resignation, and confirming that his employment separation would be effective July 26, 2010." ECF No. 19-1 at 18. Defendant does not dispute, however, that had Taylor not chosen to resign, it would have terminated his employment. See, e.g., ECF No. 19-24 at 5-6.

The Court finds that Taylor has raised a genuine issue of material fact regarding the existence of adverse employment

_____

[3] There is no dispute that, if Taylor was in fact terminated, it would constitute an adverse employment action.

action.  Taylor denies stating that he would be submitting his
resignation,[4] and argues that even if he did, the plain language
of Long's e-mail suggests that he planned to submit, in the
future, his resignation, but that he had not actually done so at
that point.  See ECF No. 22-1 at 16 (noting that Long's e-mail
states that "shortly we will receive his 'resignation and other
paperwork'" and that "the plain language of this email reveals
that although Mr. Taylor indicated his resignation would be
forthcoming, he had not yet resigned") (quoting ECF No. 19-25)
(emphasis in original).  Because PRMC acknowledges that it never
received a written resignation from him, he argues that there
was no resignation for PRMC to "accept" on the basis of the
telephone conversation with Ms. Long.

Moreover, the correspondence sent to Taylor by PRMC
informing him of his separation, which was entitled
"Disciplinary Action" and contained summaries of his allegedly
wrongful behavior, see ECF No. 22-14, suggests that PRMC

---

[4] Defendant raises numerous, serious credibility allegations with
respect to Taylor.  Specifically, Defendant alleges that
Plaintiff has previously been accused of unemployment fraud, has
misrepresented his attendance at colleges and universities, and
has falsified information on employment applications.  See ECF
No. 25 at 5.  Additionally, Defendant notes that Taylor
previously made allegations against two prior employers for
racial discrimination, see ECF Nos. 19-31, 19-32, 19-33, despite
testifying to the contrary in his deposition.  See ECF No. 19-5
at 13-15.  Credibility determinations are not, however,
appropriate considerations for the Court on a motion for summary
judgment.

intended to terminate him.  At Taylor's unemployment benefits

hearing, PRMC Employee Relations Manager Craig Koppenhaver

stated, in relevant part, that "Mr. Taylor verbally communicated

to the assistant to our president that he was resigning, that we

would get it, be getting a letter from him.  He never submitted

a letter of resignation.  We ended up terminating him."[5]  ECF No.

19-24 at 5.  Additionally, although not dispositive of the issue

before this Court, see generally Ross v. Commc'ns Satellite

Corp., 759 F.2d 355, 362-63 (4th Cir. 1985) (noting that

decisions of the ESA Appeals Referee do not have preclusive

effect in a Title VII retaliatory discharge and harassment

suit), overruled on other grounds, Price Waterhouse v. Hopkins,

490 U.S. 228 (1989), the unemployment benefits hearing examiner

concluded that Taylor was discharged from his employment by

PRMC.  See ECF No. 22-16.

    With regard to the third element – a causal relationship

between the protected activity and the adverse employment action

– Defendant argues that Taylor's retaliation claims "rest solely

on his bald assertions, unsubstantiated allegations, conjecture

and speculation, and that he has no evidence of any causal

---

[5] Koppenhaver also stated that PRMC "waited for [Taylor's]
resignation.  When he didn't submit his resignation, we decided
that we had to bring this to closure somehow.  Based on the
conduct that he exhibited with Ms. Scott on July 15, had he not
chosen to resign, our decision would have been to terminate.  So
for all intents and purposes this is a discharge."  ECF No. 19-
24 at 5-6.

connection between his complaints of racial discrimination and the alleged adverse employment actions taken." ECF No. 19-1 at 54. Taylor contends that the temporal proximity between the protected conduct and the alleged retaliatory action can support – or at least create a genuine issue of material fact as to – his claim.

The Supreme Court recently held that, to establish causality in an employment retaliation case, the plaintiff must demonstrate "but-for" causation – or "'that the harm would not have occurred' in the absence of – that is, but for – the defendant's conduct." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013). Prior to Nassar, "[c]lose temporal proximity between the employee's protected conduct and the adverse employment action [was] sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Shaffer v. ACS Gov't Servs., Inc., 454 F. Supp. 2d 330, 335 (D. Md. 2006) (quoting Brungart v. BellSouth Telecommc'ns, Inc., 231 F.3d 791, 794 (11th Cir. 2000)).

The Court does not believe that Nassar significantly impacts the analysis where a plaintiff asserts a causal connection based on close temporal proximity between the protected conduct and the adverse employment action. See, e.g., Zann Kwan v. Andalex TGroup, LLC, 737 F.3d 834, 845 (2d Cir. 2013). Here, Defendant discharged Taylor from his employment

within weeks – not months, which has been previously considered too attenuated, see, e.g., Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) – of each asserted instance of protected activity. Accordingly, Taylor has raised an inference of causality sufficient to survive summary judgment.

If the plaintiff establishes a prima facie case of retaliatory discharge, the burden shifts to the defendant to "articulate a lawful, non-retaliatory reason for the adverse employment decision." Shaffer, 454 F. Supp. 2d at 335-36 (citing McDonnell-Douglas Corp., 411 U.S. 792; Williams, 871 F.2d at 457). Here, Defendant has done exactly that, by detailing Taylor's uncooperative behavior during the investigation into Chief Tull's alleged sexual misconduct, his failure to assist the employee in the parking garage, and his "improper, abusive, and even frightening" conduct during his meeting with Scott. See ECF No. 19-1 at 49. Defendant describes Taylor's course of conduct in June and July 2010 as escalating, to the point that he could no longer be considered a trustworthy employee. By articulating its concerns with Taylor's performance in the workplace environment, Defendant has stated a lawful, non-retaliatory reason for his alleged discharge.

Under the McDonnell-Douglas framework, therefore, "the burden shifts back on the plaintiff to establish that the proffered explanation is pretextual."[6] Shaffer, 454 F. Supp. 2d at 336. To meet this burden, Taylor must persuade the Court that an illegal reason "more than likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Thus, to demonstrate pretext, the employee "must point to facts that render the employer's reason so questionable as to raise an inference of deceit." Bryan v. Prince George's Cnty., No. DKC-10-2452, 2011 WL 2540759, at *6 (D. Md. July 5, 2011). It is also sufficient if the plaintiff discredits the employer's proffered nondiscriminatory reason and, if so, that "leads to the inference that the likely alterative explanation is

---

[6] Courts that have considered causation in this context post-Nassar have not come to agreement regarding whether it factors into the analysis only with respect to the prima facie case, or also with respect to pretext. Compare Foster v. Univ. of Md. Eastern Shore, Civ. No. TJS-10-1933, 2013 WL 5487813, at *6 n.6 (D. Md. Sept. 27, 2013) (noting that Nassar did not address the issue, and that "[i]t is difficult to understand how Nassar's heightened standard of causation could apply at the pretext stage of the McDonnell-Douglas analysis") with Dall v. St. Catherine of Siena Med. Ctr., No. 11-CV-0444 (MKB), 2013 WL 4432354, at *22 n.15 (E.D.N.Y. Aug. 14, 2013) ("While temporal proximity [between the protected activity and the adverse action] alone may still be sufficient at the prima facie stage [post-Nassar], it is not sufficient at the pretext stage.").

purposeful [retaliation]." Dugan v. Albemarle Cnty. Sch. Bd.,
293 F.3d 716, 722 (4th Cir. 2002).

Taylor claims that PRMC's explanation for his discharge is
pretextual because (1) the investigation into Taylor's actions
had not yet concluded at the time of his separation; (2) PRMC
alleges that it did not terminate him, and thus any proffered
justification must be pretextual; (3) he did nothing wrong in
regard to the parking lot incident; (4) he cannot legitimately
be disciplined for participating in an investigation "into
whether a high-ranking PRMC employee sexually harassed an
employee;" and (5) he did not engage in threatening behavior
during his July 15 meeting with Scott.

Taylor has not brought forth sufficient evidence to
demonstrate that his expressed concerns more than likely
motivated PRMC to terminate his employment, or that PRMC's
proffered nondiscriminatory reasons for his termination are
unworthy of credence.  Although Defendant maintains that it did
not terminate Taylor, it does not dispute that, had Taylor not
preemptively indicated that he would resign, it would have
terminated him.  In fact, PRMC representatives testified to that
effect at Taylor's unemployment benefits hearing.  See ECF No.
19-24 at 5-6 (testimony of Craig Koppenhaver).  To the extent
that Taylor argues that it was not his responsibility to
participate in the investigation into Chief Tull, his assertions

22

only serve to underscore Defendant's concerns regarding his uncooperative attitude and demeanor.  He has not raised any fact or inconsistency in explanation that would render PRMC's explanation of his discharge worthy of discredit.

Moreover, Taylor's only "evidence" regarding the pretextual nature of PRMC's proffered nondiscriminatory reasons is his insistence that PRMC is mischaracterizing his behavior. Although Taylor disagrees with Defendant's characterizations and perceptions of him and his conduct during the course of the investigations, he has not provided any evidence showing that Defendant's stated reasons for its actions did not, actually, form the basis for its conduct.  "It is not enough for Plaintiff to allege pretext based on [his] own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is to proffer evidence showing that Defendant's stated reason was not the real reason for its actions."  Khoury v. Meserve, 268 F. Supp. 2d 600, 615 (D. Md. 2003).  See also Rogosin v. Mayor & City Council of Balt., 197 F. Supp. 2d 345, 353 (D. Md. 2002) ("Whether [the employer's] beliefs were right or wrong is immaterial; what is relevant . . . is that [the employer] relied on those beliefs as grounds for dismissing Plaintiffs.").  Here, Taylor has provided the Court only his own speculation regarding the motives of PRMC officials and thus has failed to demonstrate that PRMC's legitimate, non-retaliatory reasons for his

dismissal were pretextual.  Accordingly, summary judgment will be granted.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted.  A separate Order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: March 10, 2014